UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER MOONEY and KEVIN BARTLETT, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>DOMINO'S PIZZA, INC., et al.<br><br>        Defendants. | Civil Action No. 1:14-cv-13723-IT |

ORDER ON MOTION FOR CLASS CERTIFICATION

September 1, 2016

TALWANI, D.J.

I.     Introduction

Plaintiffs Alexander Mooney and Kevin Bartlett bring this putative wage and hour class action against their former employer, franchisee Defendant G.D.S. Enterprises, Inc. ("GDS"); its franchisor, Defendant Domino's Pizza, LLC ("Domino's"); and the president of GDS, Defendant Geoffrey Schembechler ("Schembechler") (collectively, "Defendants"). Before the court is Plaintiffs' Motion for Class Certification [#44]. For the following reasons, Plaintiffs' motion is ALLOWED.

II.     Background

GDS operates seven Domino's pizza stores in Massachusetts. Second Am. Class Action Compl. ¶¶ 4, 10 ["Second Am. Compl."] [#47]. Plaintiffs worked for GDS as delivery drivers: Mooney was employed from March 2012 to November 2015; Bartlett from October 2010 to

March 2014. Id. ¶¶ 12, 13.

When Plaintiffs were hired, GDS paid $5.00 per hour plus tips. Id. ¶¶ 12, 13, 16. In October 2012, Mooney's wage was increased to $7.00 per hour plus tips. Id. ¶¶ 12, 16. In 2013, both Plaintiffs' wages were increased to $8.00 per hour plus tips. Id. ¶¶ 12, 13, 16. Throughout the time they were employed, GDS charged customers a delivery charge that Plaintiffs contend should have been, but was not, remitted to them. Id. ¶¶ 18, 20, 28. Plaintiffs also allege that they were paid the same hourly wages when they were doing tasks besides deliveries, specifically, "inside work" at the pizza stores before and after deliveries, for which they received no tips. Id. ¶¶ 16, 38.

Plaintiffs allege that Defendants violated the Massachusetts Tips Law, Mass. Gen. Laws ch. 149, § 152A, by not remitting the delivery charge to delivery drivers. Second Am. Compl. ¶ 37. Plaintiffs also contend that, because class members did not receive tips for their "inside work," GDS and Schembechler were precluded, under Mass. Gen. Laws ch. 151, § 20, from paying them a tipped minimum wage for that work. Second Am. Compl ¶ 38. Plaintiffs assert two causes of action: Count I under Mass. Gen. Laws ch. 149, §§ 150, 152A, for Defendants' retention of the delivery charges; and Count II under the Massachusetts Minimum Wage Law, Mass Gen. Laws ch. 151, §§ 1, 7, 20, for GDS and Schembechler's payment of a tipped wage, based both on the retention of the delivery charges and the payment of a tipped wage for "inside work." Second Am. Compl ¶¶ 37, 38.

Defendants dispute that the delivery charge is covered by the Massachusetts Tips Law and contend that, if it is, Defendants are protected by a safe harbor provision. Defendants assert further that the "inside work" was related to Plaintiffs' delivery work and that Defendants were not required to pay a regular minimum wage for time spent on such duties.

2

Plaintiffs now move for class certification.

III. Discussion

Plaintiffs "must affirmatively demonstrate . . . compliance" with Federal Rule of Civil Procedure 23 to maintain a class action. Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)). Under Rule 23(a), the party seeking class certification must demonstrate that four prerequisites are met: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Once these prerequisites are satisfied, a party seeking class certification "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." Comcast Corp., 133 S. Ct. at 1432. Here, Plaintiffs seek certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

 A. Rule 23(a) Factors

  1. Numerosity

The numerosity requirement of Rule 23(a) is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The threshold for numerosity is "low." García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (citing Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) (noting that "generally[,] if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met")). The court "may draw reasonable inferences from the facts presented to find the

requisite numerosity." McCuin v. Sec'y of Health & Human Servs., 817 F.2d 161, 167 (1st Cir. 1987).

Plaintiffs contend that a class comprised of current and former drivers will exceed 100 members. Second Am. Compl. ¶ 7. GDS, at the time of Defendant Schembechler's deposition, had an estimated sixty to seventy drivers. Churchill Aff. Ex. 1 24 [#45-1] (Schembechler Dep.). Even sixty to seventy drivers would satisfy Rule 23(a)(1). See García-Rubiera, 570 F.3d at 460 (citing Stewart, 275 F.3d at 226-27). Accordingly, numerosity is satisfied.

### 2. *Commonality*

To establish commonality, Plaintiffs must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that class members "have suffered the same injury," such that their claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 349-50. Raising common questions, therefore, is not enough; "rather[,] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." Id. (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)). In wage and hour class actions, "courts have found the commonality requirement met where employees alleged per se illegal wage policies that violated the rights of all class members." Garcia v. E.J. Amusements of N.H., Inc., 98 F. Supp. 3d 277, 286 (D. Mass. 2015) (collecting cases).

#### a. *Delivery Charge*

Plaintiffs point to the common question of whether the delivery charge retained by Defendants was a "service charge" within the meaning of the Tips Act. Defendants concede that

the question of whether the delivery charge is a service charge is common but contend that it does not have an answer common to all class members. Defendants argue that whether the delivery charge may be considered a "service charge" under Mass. Gen. Laws ch. 149, § 152A, depends on the circumstances of each customer's encounter with the delivery fee and that those circumstances will vary by each customer. Defendants argue further that they are entitled to a safe harbor, based not only on their notices to customers, but also on specific conversations that they may have had with delivery drivers about the delivery charge.

In determining whether the Tips Act allows for evaluations of each employee's and each customer's individual transactions, or evaluates liability based on the employer's policies and practices, the court begins with the language of the statute. Matamoros v. Starbucks Corp., 699 F.3d 129, 134 (1st Cir. 2012) (stating that the inquiry into the meaning of the Tips Act "starts with the language of the statute itself"). Under Mass. Gen. Laws ch. 149, § 152A(d),

> [i]f an employer or person submits a bill, invoice or charge to a patron or other person that imposes a service charge or tip, the total proceeds of that service charge or tip shall be remitted only to the wait staff employees, service employees, or service bartenders in proportion to the service provided by those employees.

The statute defines a "service charge" to include "a fee charged by an employer to a patron in lieu of a tip to any wait staff employee, service employee, or service bartender, including any fee designated as a service charge, tip, gratuity, or a fee that a patron or other consumer would reasonably expect to be given to a wait staff employee, service employee, or service bartender in lieu of, or in addition to, a tip." Id., § 152A(a). At the same time, the statute permits an employer to impose on a patron

> any house or administrative fee in addition to or instead of a service charge or tip, if the employer provides a designation or written description of that house or administrative fee, which informs the patron that the fee does not represent a tip or service

5

> charge for wait staff employees, service employees, or service bartenders.

Id. § 152A(d).

Under this statutory scheme, the employer's actions are key. First, "'any fee designated [by the person charging the fee] as a service charge, tip, [or] gratuity'—regardless of the employer's, employee's, or patron's intent or expectation—is automatically rendered a 'service charge' under the . . . Tips Act. G.L. c[h]. 149, § 152A(a )." Bednark v. Catania Hosp. Grp., Inc., 942 N.E.2d 1007, 1014 (Mass. App. Ct. 2011); see also DiFiore v. Am. Airlines, Inc., 910 N.E.2d 889, 892 & n.7 (Mass. 2009) (approving jury instructions that a service charge subject to the tip statute includes a fee designated by the party charging the fee as a "service charge, tip, or gratuity"). "Second, 'a fee that a patron or other consumer would reasonably expect to be given to a wait staff employee, service employee, or service bartender in lieu of, or in addition to, a tip' also constitutes a 'service charge,'" Bednark, 942 N.E.2d at 1014 (quoting Mass. Gen. Laws ch. 149, § 152A(a)), but the employer may impose a "house or administrative fee . . . if the *employer* provides" the required information informing the patron that the fee does not represent a tip or service charge, Mass. Gen. Laws ch. 149, § 152A(d) (emphasis added); see also Bednark, 942 N.E.2d at 1015 (holding that "Section 152A(d) of the Tips Act requires *an employer* to do something more than simply label a fee as 'house' or 'administrative,' in order to *dispel the possibility* that a patron reasonably would believe that the fee is a gratuity." (emphases added)); see also Carpaneda v. Domino's Pizza, Inc., 991 F. Supp. 2d. 270, 274 (D. Mass. 2014) (stating that, where an employer provides notice that a certain fee does not constitute a tip, what a customer would reasonably expect depends on whether the notice "was sufficiently clear and unambiguous so that no reasonable customer would think it was a tip for the driver").

Accordingly, the plain language of the statute suggests that the inquiry is focused primarily on the employer's designation of the fee it charges and any written description of that charge, and not on the customer's individual circumstances or statements by an individual employee to a particular customer.

Defendants rely heavily on Luiken v. Domino's Pizza, LLC, 705 F.3d 370 (8th Cir. 2013). The plaintiffs in Luiken sought certification of a class of delivery drivers employed by a Domino's Pizza franchisee in Minnesota, arguing that their employer's delivery charge was a "gratuity" within the meaning of a Minnesota tips statute, Minn. Stat. § 177.24(3), and that the employer had improperly withheld it from class members. Luiken, 705 F.3d at 372. The District Court certified the class but the Eighth Circuit reversed, holding that the Minnesota statute's definition of gratuities at Minn. Stat. § 117.23(9) as including charges "which might reasonably be construed by *the* guest, customer, or patron . . ." as being a payment for personal services "refer[s] to someone specific." Luiken, 705 F.3d at 372, 373 (citing Flandreau Santee Sioux Tribe v. United States, 197 F.3d 949, 952 (8th Cir. 1999) ("[T]he 'use of "the person" refers to someone specific'") and State v. Hohenwald, 815 N.W.2d 823, 830 (Minn. 2012) ("The definite article 'the' is a word of limitation that indicates a reference to a specific object.")). The Massachusetts statute, in contrast, includes no such limiting language.

Nor does Massachusetts case law support the transaction-by-transaction approach endorsed by the Luiken court. Massachusetts courts instead have construed the Tips Act to "essentially impose[] strict civil liability upon the employer" if "protected employees do not receive . . . service charges to which they are entitled." Bednark, 942 N.E.2d at 1010-11. The Supreme Judicial Court has emphasized that "[t]he [Massachusetts] Legislature intended to ensure that service employees receive all the proceeds from service charges, and any

7

interpretation of the definition of 'service charge' must reflect that intent." DiFiore, 910 N.E.2d at 895; see also id. at 897 (adjusting the definition of "service charge" to prevent "an 'end run' around the Act [that] would contravene the express purpose of the Act, namely to protect gratuity payments given to, or intended for, service employees.").

Accordingly, evaluation of whether the delivery was a "service charge" under the Tips Act cannot turn on the sort of individual circumstances proposed by Defendants, such as what a class member did or did not say to a customer. Defendants' proposed analysis would unreasonably shift the burdens imposed by the Tips Act on the employer to the employee and make application of the Act unreasonably cumbersome. See Cooney v. Compass Grp. Foodservice, 870 N.E.2d 668, 672 (Mass. App. Ct. 2007) (rejecting a reading of the term "service charge" in the Tips Act, under which "whether specific invoiced charges are in fact charges in the nature of a tip or gratuity would be ascertained on a case-by-case basis," in favor of a reading that views "service charge" "in the context of the Tips Act as a whole" and is "consonant with sound reason and common sense"). Moreover, Defendants' proposed interpretation would make the Tips Act effectively unenforceable even in single-plaintiff litigation, as no employee would be able to litigate the specific circumstances of the individual customer interactions, undoubtedly resulting in situations in which employees were improperly deprived of tips. "Such an interpretation . . . would fly in the face of the 'express purpose' of the Act: to 'protect gratuity payments given to, or intended for, service employees.'" Bednark, 942 N.E.2d at 1015 (quoting DiFiore, 910 N.E.2d at 897).

Thus, to determine if the fee charged by the employer is a service charge under the Tips Act, a fact-finder would need to review the designation given by Defendants to the fee and the written notices Defendants provided to customers about the fee, and determine whether

8

Defendants have "*dispel[led] the possibility* that a patron would reasonably believe that the fee is a gratuity." Bednark, 942 N.E.2d at 1015 (emphasis added). While these notices may have varied over time and medium (such as on websites, pizza boxes, and apps), the answer as to whether the notices were sufficient for any given time period or ordering method will be common to class members, thereby satisfying commonality as to the delivery charge claim.

      b. *Inside Work*

Plaintiffs contend that they did not receive tips for "inside work." They assert that whether delivery drivers were entitled to a regular minimum wage rather than a tipped wage for such "inside work" is common to all class members. GDS and Schembechler (to whom the minimum wage cause of action applies) again argue that, though the question may be common, the answers are not. They contend that differences in the "inside work" performed by individual class members require case-by-case determinations as to whether class members should have been paid minimum wage for "unrelated work" rather than a tipped wage for "related work."[1]

---

[1] GDS and Schembechler argue in their surreply that Mooney also was engaged in direct tip-producing work while inside the restaurant. This new argument is not properly before the court. Plaintiffs alleged in the Second Amended Complaint that they did not receive tips for their "inside work," Second Am Compl. ¶ 16, and repeated this claim in their moving papers, Pls. Mot. for Class Certification 1 [#44]. GDS and Schembechler made no mention of the purported receipt of tips for "inside work" in their opposition. Instead, they raised it for the first time after seeking leave to file a surreply only to address unforeseen arguments. In any event, GDS and Schembechler point to no evidence in the record that Mooney received tips for "inside work." Mooney testified that he sometimes would bring a pizza box over to customers seated at one of the two tables in the Chelmsford store and would ask if the customers needed any plates or napkins. Blake Decl. Ex. 1 89 [#54-1]. Mooney testified that, alternatively, he might just hand the food across the counter to the customer. Id. at 90. Mooney further testified that, on other occasions, the counter person would call out a customer's name so the customer could come pick up his pizza for himself. Id. GDS and Schembechler offer no evidence supporting the assertion that any of Mooney's "inside work" generated tips.

9

Defendants point to Fair Labor Standards Act regulation 29 C.F.R. § 531.56(e) in support of this argument.[2] That regulation describes two scenarios: (1) when an employee performs some duties that produce tips and other duties that are so unrelated to his tip-producing work that the employee is effectively employed in two occupations; and (2) when an employee performs some duties that produce tips and other duties that are "related" to the tip-earning duties but which do not earn tips in themselves. See 29 C.F.R. § 531.56(e). In the first scenario, the employer may pay the employee a tipped wage for time spent on tip-producing duties but must pay the employee at least the regular minimum wage for time spent in his "second" occupation. Id. In the second scenario, the employer may pay the employee a tipped wage for time spent on both tip-producing duties and "related duties," even if those related duties do not by themselves produce tips. Id.; see also *DOL Fact Sheet #15: Tipped Employees under the FLSA*, 2 (July 2013), https://www.dol.gov/whd/regs/compliance/whdfs15.pdf ["DOL Fact Sheet #15] (stating that "[t]he FLSA permits an employer to take a tip credit for some time that the tipped employee spends in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips").

The Department of Labor and courts have stated, however, that, when a tipped employee spends a "substantial" amount of time—generally defined as more than 20 percent of his workweek—performing related duties, the employer may not pay him a tipped wage for any time spent on such related duties. See DOL Fact Sheet #15 at 2; see also Fast v. Applebee's Int'l, Inc., 638 F.3d 872, 877-78, 880 (8th Cir. 2011) (deferring to the DOL Handbook's interpretation of the 29 C.F.R. § 531.56(e) and stating that "where . . . tipped employees spend a substantial

---

[2] The parties agree that the FLSA provides the relevant standard, even though this case is brought under state law. See Defs.' Opp'n 13 n. 9 [#52]; Pls.' Reply 3 n. 3 [#60] (citing Vitali v. Reit Mgmt. & Research, LLC, 36 N.E.3d 64, 69 (Mass. App. Ct. 2015) ("[I]n interpreting the State [wage] law, we look to how the FLSA has been construed.")).

10

amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties"). Thus, if a class member spent less than 80 percent of his workweek delivering pizzas, then GDS and Schembechler may not pay him a tipped minimum wage for time spent not delivering pizzas—regardless of whether that time is spent on related or unrelated work. This critical threshold question—*whether* a given class members spent less than 80 percent of his workweek delivering pizzas—is a common question of fact that is readily ascertainable for all class members from Defendants' time records which show when class members clocked in and out of the restaurant for deliveries. See Churchill Aff. Ex.7 [#46-7] (Mooney Payroll Records) & Ex. 9 [#45-7] (Bartlett Payroll Records).

Moreover, if class members did spend more than 80 percent of their workweek delivering pizzas, then the court will have to resolve whether the duties performed inside were truly "related" to the tip-producing work. Whether answering phones, folding boxes, preparing deliveries, and any other task performed by class members while inside is "related" to delivering pizzas is a legal question that will be common to all class members. See Driver v. AppleIllinois, LLC, 265 F.R.D. 293, 312 (N.D. Ill. 2010) ("[T]he interpretation of 'related duties' under the FLSA and the regulations . . . is a legal issue for the court."). Having the court answer that legal question as to all class members will allow adjudication of GDS and Schembechler's related duties defense in one stroke. Accordingly, the assertion of the related duties defense supports, rather than defeats, commonality.

GDS and Schembechler argue finally that evidence in the record suggests that some class members were engaged in what GDS and Schembechler concede were "dual occupations" (for which minimum wage should have been owed). Defendants point to Plaintiff Bartlett's

11

deposition testimony that he did some "handyman-type work" while inside, including electrical work, fixing sinks, and hanging shelves. See Blake Decl. Ex. 2 28-30 [#54-2] (Bartlett Dep.). Defendants contend that an individualized examination of each class member's work therefore is necessary for their "related duties" defense. According to GDS and Schembechler, this too defeats commonality.

This argument turns logic on its head. That drivers performed some additional work that GDS and Schembechler concede should have been paid at the minimum wage rate does not prevent these defendants from seeking to establish a defense that the other "inside work"—such as "answering phones, preparing food, assembling pizza boxes, and the like," Second Am. Compl. ¶ 16—was related to the delivery work.

In any event, the minimum wage laws place certain obligations on employers to keep accurate records of the time an employee spends in a particular occupation. See Mass. Gen. Laws ch. 151, § 15 (mandating that employers keep accurate records of employee information including amount paid, hours worked, and occupation); see also Metro Equip. Corp., 904 N.E.2d 432, 438-39 (Mass. App. Ct. 2009) (stating that the recordkeeping requirement of Mass. Gen. Laws ch. 151, § 15 serves the minimum wage statute's regulatory purpose). Thus, to the extent that class members were engaged in a "dual occupation" of handyman or maintenance, distinct from the purportedly related work of "answering phones, preparing food, assembling pizza boxes, and the like," Second Am. Compl. ¶ 16, then GDS and Schembechler should have kept records of the time the class members were employed in that second occupation.

While an employee bears the burden of establishing that he was not paid wages to which he was entitled, he ordinarily may discharge this burden by producing records kept by the employer. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946). But where an

employer fails to keep accurate time records, "[t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." Id. at 687. Rather, in such cases,

> an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.

Id. at 687-88; see also Sec'y of Labor v. DeSisto, 929 F.2d 789, 792 (1st Cir. 1991) ("Where the employer has failed to keep adequate employment records, it pays for that failure at trial by bearing the lion's share of the burden of proof.")

The type of evidence that an employee may use to meet his initial burden when an employer has failed to keep adequate records includes representative sample evidence. See Desisto, 929 F.2d at 792 & n.1. Evidence that is competent to establish liability for individual wage and hour claims may be used to establish liability and damages in class claims. Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1046 (2016) ("In a case where representative evidence is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class."); see also Reich v. Gateway Press, Inc., 13 F.3d 685, 701 (3d Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees." (collecting cases)). Thus, to the extent GDS and Schembechler are correct that their own time records are insufficient to allow adjudication of Plaintiffs' "inside work" claim on an individual *or* class basis, representative testimony as to how many hours class members typically spent performing particular duties while inside will supply the necessary common evidence. See Garcia, 98 F. Supp. 3d at 281, 287 (certifying

13

overtime and minimum wage classes and finding commonality was satisfied because the plaintiff could use "representative testimony from [other] employees as common proof of the hours worked by the class" where the employer had failed to keep adequate time records). The use of such representative testimony would allow a common answer to the common question of whether class members were entitled to a regular minimum wage for all, some, or no time spent inside. Accordingly, that some class members may have been engaged in different duties while working inside does not defeat commonality.

### 3. Typicality

Rule 23(a)(3) requires that the claims and defenses of the class representatives be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality examines "whether the named plaintiff[s'] claim[s] and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Dukes, 564 U.S. at 349 n.5 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157-58 n.13 (1982)). "The central inquiry in determining whether a proposed class has 'typicality' is whether the class representatives' claims have the same essential characteristics of the other members of the class." Garcia, 98 F. Supp. 3d at 288 (citation omitted).

#### a. Delivery Charge

In light of the court's conclusion that the delivery charge claims hinge on the notices that Defendants provided to customers and not any information that a class member may have volunteered to customers, and because Defendants' notices were the same for Plaintiffs as they were for the potential class members at any given time, Plaintiffs have demonstrated that their claims as to the service charge class have the same essential characteristics as the other class members. Accordingly, typicality is satisfied as to the service charge class.

### b. Inside Work

Plaintiffs' "inside work" claim is based on the contention that, regardless of the type of work performed inside, class members were entitled to a regular minimum wage for all inside time. Thus, in the relevant respects, Plaintiffs' claims are typical of each other and of the class, and typicality is established as to the minimum wage class.

### 4. Adequacy

Rule 23(a)(4) allows certification only if the class representatives "will fairly and adequately protect the interests of the class." To demonstrate adequacy, "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of any class members." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). Second, the moving party must show that chosen counsel "is qualified, experienced and able to vigorously conduct the proposed litigation." Id.

Neither side has produced evidence of conflict among the interests of Plaintiffs and proposed class members. Plaintiffs' attorneys are likewise qualified and experienced in employment law and class litigation. See Churchill Aff. ¶¶ 1-6 [#45]; Cassavant Aff. ¶¶ 1-3 [#46]. Adequacy is therefore established.

## B. Rule 23(b)(3)

Plaintiffs must also satisfy at least one of the provisions of Rule 23(b). Here, Plaintiffs meet the requirements of Rule 23(b)(3).

### 1. Predominance

The predominance requirement is similar to but "far more demanding" than the commonality requirement. In re New Motor Vehicle Canadian Export Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997)). The

predominance inquiry requires the court to "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000). When there is a common course of conduct, class adjudication is appropriate "[a]s long as a sufficient constellation of common issues binds class members together." See id. at 296.

### a. Delivery Charge

Litigating Plaintiffs' service charge claims will require the trier of fact to determine whether, based on information and notices furnished by Defendants, a customer would "reasonably expect" the delivery fee to be given to the driver. Plaintiffs note that records from Domino's "PULSE" system will show how many customers ordered pizzas through a given ordering method (phone, app, or website), with a particular payment method, at a particular period of time, and that the trier of fact can review the notices and information Defendants provided to customers through each ordering method, during each time period, and with each payment method to determine whether, based on that information, a particular class or classes of customers "would reasonably expect" the delivery fee to be given to the driver. See Mass. Gen. Laws ch. 149, § 152A(a). Accordingly, the evidence necessary to resolve whether Defendants' notices for a given class of orders were sufficient and how many such orders were placed will be common to class members. The court foresees no individual issues that would get in the way of class adjudication. Thus, predominance is satisfied as to the service charge class.

### b. Inside Work

Adjudication of Plaintiffs' "inside work" claim likewise will require adjudication of a number of common questions that will predominate over individual ones. First, the trier of fact will have to determine whether a class member was delivering pizzas—*i.e.*, engaged in direct tip-

producing work—for at least 80 percent of his workweek. This common question of fact will be answered by GDS' and Schembechler's time records, evidence common to all class members. If the answer to this first question is "no," then class members were entitled to a regular minimum wage for work performed indoors. If the answer to the first question is "yes," then class members were not entitled to a regular minimum wage for inside time for performing "related" duties during that time. The court then will be required to make a common legal determination as to which type of duties are "related" to pizza delivery and which duties constitute a "dual occupation." The court's answer to the first legal question will apply equally to all class members. The trier of fact will need to determine what proportion of class members' inside time was spent in each classification of duty. The trier of fact's answer to this question could be answered by GDS' and Schembechler's time records as to each class member, or by representative testimony to the extent those time records fail to accurately show the time class members were employed in each occupation. In either case, the evidence will be common to all class members and will generate answers on liability common to all class members. These common legal and factual issues thus bind the class and satisfy predominance. See Waste Mgmt., 208 F.3d at 298.

### 2. *Superiority*

Class adjudication is superior when it will "achieve economies of time, effort, and expense" as well as promoting uniformity among class members "without sacrificing procedural fairness or bringing about other undesirable results." Amchem Prods., Inc., 521 U.S. at 615. Superiority also is met when "[r]esolution of the common issues in a single judicial forum will promote judicial economy and uniformity of outcome." See McLaughlin v. Liberty Mutual Ins. Co., 224 F.R.D. 304, 312 (D. Mass. 2004). Class action is often a superior method of

adjudication where potential plaintiffs lack the incentive or means to litigate individually. See Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 41 (1st Cir. 2003) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).

As the issues for all class members are capable of resolution in one stroke, a class action would be the superior method of adjudication here, promoting uniformity of outcome and judicial economy. Moreover, the high costs of litigating these cases individually when compared to the value of the individual claim underscores the superiority of class action for addressing these claims. See Smilow, 323 F.3d at 41. Superiority is therefore established as to both classes.

IV. Conclusion

For the reasons set forth above, Plaintiffs' Motion for Class Certification [#44] is ALLOWED. Pursuant to Rule 23(c)(1)(B), which requires the class certification order to "define the class and the class claims, issues, or defenses," the classes are certified as follows:

The "Service Charge Class":

> All individuals who have worked as delivery drivers for GDS from September 28, 2011 to the present.

The "Minimum Wage Class":

> All individuals who have worked as deliver drivers for GDS from September 28, 2011 to the present and were paid a tipped minimum wage.

Pursuant to Rule 23(g) and the reasons discussed above, the court appoints Stephen Churchill and Brian Cassavant of Fair Work, P.C. as class counsel.

By September 16, 2016, after conferring with Defendants' counsel, class counsel shall provide a proposed notice—which shall include a description of the claims in this case, the

classes, the class representatives, and class counsel—and propose to the court a plan for providing notice of the certification of the classes to the classes. Defendants may file any response to the proposed notice and plan no later than fourteen days thereafter.

    IT IS SO ORDERED.

Date: September 1, 2016                                                   /s/ Indira Talwani
                                                                                         United States District Judge