UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| | : |
| ALEXANDER MOONEY and KEVIN BARTLETT, | : |
| Individually and on behalf of all others similarly situated, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Case No. 1:14-cv-13723-IT |
| | : |
| DOMINO'S PIZZA, INC.; DOMINO'S PIZZA LLC; | : |
| GDS ENTERPRISES, INC.; GEOFFREY D. | : |
| SCHEMBECHLER; and AMY SCHEMBECHLER, | : |
| | : |
| Defendants. | : |
| | : |

**ASSENTED-TO MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT**

Pursuant to Fed. R. Civ. P. 23, plaintiffs seek preliminary approval of a proposed class

settlement and approval of a notice and claim form to be issued to class members. A proposed

order is attached as Ex. 1.

**Introduction**

This action was brought on behalf of delivery drivers for Domino's stores owned and

operated by defendant GDS Enterprises, Inc. ("GDS"), a Domino's franchisee. The drivers were

not permitted to retain "delivery charges" that GDS added to customer orders, and, for at least a

portion of the class period, drivers were paid only a tipped minimum wage for all of their hours,

including time spent performing deliveries and time spent inside the store. The plaintiffs make

two principal claims: (1) under the Massachusetts Tips Law, Mass. Gen. Laws ch. 149, § 152A,

delivery charges were gratuities that should have been paid to the drivers, and (2) under the

Massachusetts Minimum Wage Law, Mass. Gen. Laws ch. 151, §§ 1 & 7, delivery drivers

should have been paid the full minimum wage instead of a tipped minimum wage, for two

reasons: (a) they did not get to keep all delivery charges, so they should have been paid the full

minimum wage for all hours, and (b) they performed substantial "inside" work, for which they

should have been paid the regular minimum wage rather than the tipped minimum wage.

The Court previously certified two classes, including (1) a "service charge class" of all

individuals who have worked as delivery drivers for GDS from September 28, 2011 to the

present, and (2) a "minimum wage class" of all individuals who have worked as delivery drivers

for GDS form September 28, 2011 to the present and were paid a tipped minimum wage. (ECF

No. 73).

The parties reached a proposed settlement agreement ("Agreement") after engaging in

extensive and lengthy arms-length negotiations – beginning with a day-long mediation with

experienced wage-and-hour mediator Mark Irvings on May 31, 2017. A copy of the Agreement,

which has been executed by the defendants and both of the named plaintiffs, is attached as Ex. 2.

In reaching this agreement, the parties were mindful of the substantial risks to all parties

from continued litigation. For the plaintiffs, those risks include the following:

- The risk that the defendants would be unable to pay a class judgment in the plaintiffs'
  favor. Although the Domino's defendants, as opposed to GDS, likely have a sufficient
  ability to pay any judgment here, their potential liability is limited to the small portion of
  delivery charges that plaintiffs allege they collected from GDS as part of royalty
  payments. GDS, who is the principal defendant, does not have the same level of
  resources, and could be pushed into bankruptcy with a substantial judgment.

- The risk that the plaintiffs would lose their claims. Most significantly, in a closely-related
  case, *Lisandro v. Domino's Pizza, Inc., et al.*, Civil Action No. 15-11584-WGY, the
  named plaintiff had an exemplar trial that ended in a verdict for the defendants on all
  claims.

- The risk that certified classes would later be decertified, either by this Court or on appeal.
  Under Fed. R. Civ. P. 23, this Court has the power to decertify a class at any point prior
  to judgment, and there is simply no way to predict what would happen if this case
  proceeded in litigation, including an appeal.

- <u>The risk that any of the two named plaintiffs would be picked off or otherwise lose their ability to serve as a class representative</u>. If anything happened with the named plaintiffs (as happened in earlier, related cases), the classes they seek to represent would be at risk of decertification.

Another important consideration supporting this settlement is the defendants' ongoing and good faith attempts to remedy the underlying bases for the asserted violations. GDS has taken corrective actions since the first of this case was filed in 2014, including the use of box toppers dedicated to providing notice to customers that a delivery charge is not a tip, the use of credit card folios with a notice that delivery charge is not a tip, and the addition of a disclosure on credit card slips that delivery charge is not a tip. Domino's, meanwhile, has moved the notice language on its website and mobile application to a more prominent location (in bold typeface directly above the "Order" button) and changed the colors on the mobile application to make the notice more visible. All of these actions likely have benefitted or will benefit drivers.

The proposed settlement calls the payment of $650,000 into a settlement fund. Although the plaintiffs' best-case scenario, making all assumptions in their favor, could result in a considerably higher judgment, the prospects of actually recovering on such a judgment are low given the risks outlined above. Indeed, there is a very substantial likelihood that a "best-case scenario" judgment would result in GDS's bankruptcy and the resulting closure or sale of its stores. When plaintiffs' counsel evaluated the case using realistic assumptions in light of the overall circumstances of the case, this settlement amount – which (based on protracted negotiations with the aid of the professional mediator) appears to represent the maximum that the defendant could and would voluntarily pay at this point – was fair, reasonable, and adequate. That is particularly true given the non-monetary steps the defendants have taken to address the underlying alleged violations.

This is a non-reversionary settlement, meaning that no money will revert back to the defendants. There will be two rounds of distributions, both for GDS's cash flow purposes and to maximize the likelihood that class members will have notice of the settlement and an opportunity to submit a claim. In accordance with the agreement, the two named plaintiffs seek incentive payments in the amount of $20,000 each, in recognition of their willingness to serve as class representatives, their efforts to advance this litigation (including depositions and a full-day mediation), and their willingness to forego larger individual settlements for the benefit of their fellow class members.[1] Plaintiffs' counsel, who have been pursuing these claims for over three years, seek fees in the amount of one-third of the settlement fund, and the plaintiffs seek up to $30,000 to cover the costs of litigation and, more significantly, of administering the settlement, including the hiring of a third-party administrator to issue notice to the class, process claims, set up a qualified settlement fund, issue payments, and submit required reports and returns. The amount to be distributed to the participating class members will be at least $365,500. Class members will receive shares in proportion to their estimated damages. To the extent any class members do not claim their shares, those unclaimed funds would be redistributed to the class members who did claim their shares, in proportion to their estimated damages.

Following initial review of the settlement by this Court, and upon the Court's approval, plaintiffs' counsel propose to send a notice and claim form ("Notice") to potential class members, a copy of which is attached as Ex. 3. The Notice describes the claims and likely defenses, the proposed settlement terms, and the plan of distribution, and it invites class members to submit claims for their share of the settlement proceeds. The Notice also will inform

---

[1] In late 2015, the two named plaintiffs were offered a combined total of $35,000 to settle their cases on an individual basis, and they rejected that offer in order to continue pursuing the case on behalf of the class.

class members of the final approval hearing and of their opportunity to voice any objections to the terms of the settlement or to opt out from the settlement.

At the hearing on this motion, the parties will request that the Court schedule a final approval hearing. In a motion for final approval and at the final approval hearing, plaintiffs will report on the results of the notice process (i.e., the class members' response to the settlement, including the number of claims submitted and whether any class members have opted out of or objected to the settlement) and will, prior to or in connection with that motion, provide detailed submissions regarding their fees and expenses.

### Argument

**1.      The proposed settlement is fair, reasonable, and adequate.**

A class action may not be compromised without court approval, which requires the court to analyze whether the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e). At the preliminary approval stage, a court should determine whether there is cause "to submit the [settlement] to class members" and hold a later hearing "as to its fairness."  *In re Traffic Executive Ass'n,* 627 F.2d 631, 634 (2d Cir. 1980). *See also* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* ("*Newberg*") (4th ed. 2002) § 11.25 ("If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness…and appears to fall within the range of possible approval," the court should permit notice to issue.). After the notice period, the Court will hold a further hearing to consider final approval in light of the class members' response to the notice and all other relevant information.

A guiding principle when analyzing whether a settlement is fair, reasonable, and adequate is the well-established recognition that courts favor settlements over continued litigation. *Durett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (when exercising discretion to

approve class action settlement, a "court's discretion is restrained by 'the clear policy in favor of encouraging settlements'") (citations omitted). *See also Newberg* § 11.41 ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

In light of the policy favoring settlements, "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement." *In re M3 Power Razor System Marketing & Sales Practice Litig.*, 270 F.R.D. 45, 62-63 (D. Mass. 2010). Specifically, when the following "procedural guidelines have been followed," there is a "presumption that the settlement is within the range of reasonableness:" "'(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Id.*, *quoting In re Lupron Mktg. and Sales Prac. Litig.*, 345 F. Supp. 2d 135, 137 (D. Mass. 2004). All four factors support approval here.

First, the negotiations occurred at arms length, including a day-long mediation with Mark Irvings. The parties took opposing positions with respect to liability and damages but were able to reach a compromise position. Second, the parties engaged in substantial discovery prior to reaching a proposed agreement. "The pertinent question is 'whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013), *quoting In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir. 2004) (internal quotation marks omitted). The parties' discovery was further supplemented by their "participation in a day-long mediation [, which] allowed them to further explore the claims and defenses." *Id*. Third, as this Court previously has recognized, plaintiffs' counsel are experienced in employment law and class action litigation. Finally, the issue of class objections cannot be evaluated until after the claim period.

2.      **The proposed payments to the named plaintiffs are fair and reasonable.**

The Court need not make a final ruling on the named plaintiffs' payments until the time

of final approval (when it can assess any objections), but the proposed payments to the named

plaintiffs are intended to compensate them for the effort and risk associated with their role in

serving as named plaintiffs over the past two years. Courts have widely recognized that incentive

awards serve an important function in promoting enforcement of state and federal law by private

individuals, while encouraging class action settlements. *See In re Relafen Antitrust Litig.*, 231

F.R.D. 52, 82 (D. Mass. 2005) ("Incentive awards are recognized as serving an important

function in promoting class action settlements"), *quoting In re Lupron*, 228 F.R.D. 75, 98 (D.

Mass. 2005); *In re Compact Disc Min. Adver. Price Antitrust Litig.*, 292 F. Supp. 2d 184, 189

(D. Me. 2003) ("Because a named plaintiff is an essential ingredient of any class action, an

incentive award can be appropriate to encourage or induce an individual to participate in the

suit"). As one court recently noted, "[s]ervice awards [i.e., incentive payments] are common in

class action cases and serve to compensate plaintiffs for the time and effort expended in assisting

the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and

any other burdens sustained by the plaintiffs. . . It is important to compensate plaintiffs for the

time they spend and the risks they take." *Beckman*, 293 F.R.D. at 483 (citations omitted).

It is not uncommon for courts to approve incentive payments in the range of those

requested in this case. *See, e.g., Gordon v. Mass. Mutual Life Ins. Co.,* No. 13-CV-30184-MP,

Order Regarding Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Case

Contribution Awards for Named Plaintiffs, at 7 (D.Mass. Nov. 3, 2016) (awarding incentive

payments of $20,000 each to named plaintiffs); *Castagna v. Madison Square Garden, L.P.*, 2011

WL 2208614, at *8 (S.D.N.Y. June 7, 2011) (awarding incentive payments of $10,000 and

$15,000 each to named plaintiffs in wage class action); Dupler v. Costco Wholesale Corp., 705 F. Supp. 2d 231, 245 (E.D.N.Y. 2010) (awarding incentive payments of $25,000 and $5,000); *Godshall v. Franklin Mint Co.*, 2004 WL 2745890, at *6 (E.D. Pa. Dec. 1, 2004) (awarding $20,000 incentive awards to each of two named plaintiffs in wage class action); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (awarding incentive payments of $25,000 and $10,000). Massachusetts courts routinely have approved comparable incentive payments.[2]

Incentive awards serve a particularly important role in employment class actions. Although plaintiffs do not contend that the defendants engaged in any retaliatory actions against them, in employment class actions generally, lead plaintiffs may risk their livelihood to bring the case forward on behalf of their fellow co-workers. Courts have recognized the important role of class actions in the employment context precisely because of this fear of potential retaliation. *See, e.g., Perez v. Safety-Kleen Systems, Inc.*, 253 F.R.D. 508, 520 (N.D. Cal. 2008) (concluding class action was superior because "some class members may fear reprisal"); *Guzman v. VLM, Inc.*, 2008 WL 597186, at *8 (E.D.N.Y. 2008) (noting "valid concern" that "many employees will be reluctant to participate in the action due to fears of retaliation"). This same consideration makes incentive awards appropriate in employment class action settlements, as well: "[Incentive] awards are particularly appropriate in the employment context. In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to

---

[2] *See, e.g., Godt et al. v. Anthony's Pier Four, Inc.,* Suffolk Civ. A. No. 07-3919 (Mass. Super. 2009) ($25,000 incentive payment for lead plaintiff); *Shea v. Weston Golf Club*, Middlesex Civ. A. No. 02-1826 (Mass. Super. 2009) ($25,000 incentive payments for lead plaintiffs); *Fernandez v. Four Seasons Hotel,* Suffolk Civ. A. No. 02-4689 (Mass. Super. 2008) ($25,000 incentive payments for lead plaintiffs); *Banks v. SBH Corp.,* Mass. Civ. A. No. 04-3515 (Mass. Super. 2007) ($25,000 incentive payments for lead plaintiffs); *Meimaridis v. Brae Burn Country Club*, Middlesex Civ. A. No. 04-3769 (Mass. Super. 2006) ($25,000 incentive payments for lead plaintiffs).

the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005).

One critical factor here is the fact that the named plaintiffs put their own interests behind those of the class. There is a substantial likelihood, based both on the history of this case and on common experience in this practice area, that if the named plaintiffs had expressed an interest in obtaining an individual settlement in return for dropping their pursuit of a class claim, they could have received greater amounts than they stand to receive from this settlement. Instead, they continued to pursue the case on behalf of their fellow class members.

**3.      The proposed fee should be preliminarily approved as reasonable.**

With respect to fees, the Court need not make a final ruling until the time of final approval (when it can assess any objections), but the proposed award of fees is reasonable. To date, plaintiffs' counsel have incurred fees in connection with substantial discovery practice, extensive analysis of that discovery, a contested class certification motion, and protracted settlement negotiations. Plaintiffs' counsel expects to spend considerably more time with the settlement approval and administration process. In addition, plaintiffs' attorneys currently have advanced over $7,000 in expenses, including expenses for mediation fees, deposition transcripts, and an initial mailing of notice to the class following certification. In or prior to their motion for final approval, Plaintiffs' counsel will submit detailed reports of their time and expenses.

Courts frequently favor an award of fees from a common fund, as called for by the proposed settlement in this case. As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. . . . Jurisdiction over the fund involved in the litigation allows a Court to prevent . . . inequity by assessing

attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted).

When awarding fees from a common fund, the "percentage of the fund" method is preferred over the lodestar method. As the First Circuit observed, the percentage method is less burdensome to administer than the lodestar method. *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995). The court also endorsed the percentage method because it is result-oriented, and therefore promotes a more efficient use of attorney time – a loadstar method may give attorneys an incentive to spend as many hours as possible on the litigation and may discourage early settlements. *Id.* When using the percentage method, courts routinely approve fee awards that represent one-third of the settlement fund.[3]

An award of 33 percent of the fund is consistent with the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees. Unlike traditional firms that receive hourly fees on a monthly basis, employment counsel who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, travel, etc.), without receiving any

---

[3]     There are numerous examples of cases in which a one-third fee was approved, including: *Chalverus v. Pegasystems, Inc.*, C.A. No. 97-12570-WGY (December 19, 2000) (awarding as an attorneys' fee one-third of a more than $5 million recovery); *In re Lithotripsy Antitrust Litigation*, No. 98 C 8394, 2000 U.S. Dist. LEXIS 8143 at *6-7 (N.D. Ill. June 12, 2000) (noting that 33.3% of the fund plus expenses is well within the generally accepted range of the attorneys fee awards in class-action lawsuits); *In re Picturetel Corporation Sec. Litig.*, C.A. No. 97-12135-DPW (D. Mass. Nov. 4, 1999) (approving award of one-third of a $12 million settlement fund); *Zeid v. Open Environment Corp.*, C.A. No. 96-12466-EFH (D. Mass. June 24, 1999) (awarding a fee of one-third of a $6 million settlement); *In re Medical X-Ray Film Antitrust Litigation*, CV-93-5904, 1998 U.S. Dist. LEXIS 14888 at *21 (E.D.N.Y. Aug. 7, 1998) (awarding a fee of $13 million, which represented one-third of the settlement); *In re Copley Pharmaceutical, Inc. Sec. Litig.*, C.A. No. 94-11897-WGY (D. Mass. Feb. 8, 1996) (awarding one-third of a $6.3 million settlement fund); *In re Crazy Eddie Securities Litig.*, 824 F. Supp. 320, 325-26 (E.D.N.Y. 1993) (awarding 34% of a $42 million fund); *Hwang v. Smith Corona Corp.*, B.89-450 (D. Conn. Mar. 12, 1992) (awarding one-third of $24 million fund).

ongoing payment for their work. Sometimes fees and expenses are recovered; other times,

despite hundreds of hours of work, nothing is recovered. This type of practice is viable only if

attorneys, having received nothing for their work on some cases, receive more in other cases than

they would if they charged hourly fees. Courts have long recognized this reality. *See, e.g.,*

*Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on

contingency, thus deferring payment of their fees until the case has ended and taking upon

themselves the risk that they will receive no payment at all, generally receive far more in

winning cases than they would if they charged an hourly rate"); *In re Union Carbide Corp.*

*Consumer Products Business Securities Litigation*, 724 F. Supp. 160, 168 (S.D.N.Y. 1989)

("Contingent fee arrangements implicitly recognize the risk factor in litigation and that the

winning cases must help pay for the losing ones if a lawyer who represents impecunious

plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth

is, will remain solvent and available to serve the public interest.")  By permitting clients to obtain

attorneys without having to pay hourly fees, this system provides critical access to the courts for

people who otherwise would not be able to find competent counsel to represent them. That

access is particularly important for the effective enforcement of public protection statutes, such

as the wage laws at issue in this case. It is well recognized that "private suits provide a

significant supplement to the limited resources available to [government enforcement agencies]

for enforcing [public protection] laws and deterring violations." *Reiter v. Sonotone Corp.*, 442

U.S. 330, 344 (1979).

**4.       The Court should approve the content and proposed distribution of the notice.**

The proposed Notice fully complies with requirements of Fed. R. Civ. P. 23(c)(2)(B), which requires notices issued in a Rule 23(b)(3) class action to include the following information:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). Plaintiffs' counsel has structured the notice to conform to these requirements, and also have included additional information to ensure that class members fully understand the background and context of the proposed settlement.

If approved, notice will sent by first-class mail to the last known addresses of all members of the proposed class. Since some proposed class members may speak Spanish or Portuguese as a first language, the notice will include a notice that it is an important legal document that should be translated if not understood. To the extent any mailings are returned as undeliverable, plaintiffs' counsel or their agents will use appropriate databases to skip-trace outdated addresses, and will promptly resend the notices and claim forms to those updated addresses. To ensure that all claims members receive notice and have an opportunity to submit claim forms, plaintiffs' counsel or their agents will send two rounds of notice. The first notice

would be sent as soon as practicable after this Court's preliminary approval of the settlement. A second notice will be send following the first round of distributions.

### Conclusion

For these reasons, plaintiffs respectfully request that the Court preliminarily approve the proposed class settlement, preliminarily certify additional classes for settlement purposes, appoint the undersigned as class counsel, and approve issuance of the proposed notice, all as set forth in the proposed order attached as Ex. 1.

Respectfully submitted,

Alexander Mooney and Kevin Bartlett, individually and on behalf of all others similarly situated,

By their attorneys,

 /s/ Stephen Churchill
Stephen S. Churchill (BBO#564158)
Brant Casavant (BBO#672614)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-6230
steve@fairworklaw.com
brant@fairworklaw.com

Dated: September 26, 2017

ASSENTED TO:


*/s/* Daniel J. Blake_____
Kevin G. Kenneally, BBO #:  550050
Kevin.Kenneally@leclairryan.com
Daniel J. Blake, BBO #:  552922
Daniel.Blake@leclairryan.com
LECLAIRRYAN, *A Professional Corporation*
One International Place, 11th Floor
Boston, MA 02110
(617) 502-8200
(617) 502-8201 – Fax

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on this date I served a copy of the above document on all counsel through the ECF system.


Dated: September 26, 2017                    /s/ Stephen Churchill
                                             Stephen Churchill