## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |  |
|---|---|---|
| ALEXANDER MOONEY and KEVIN BARTLETT, Individually and on behalf of all others similarly situated, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | Case No. 1:14-cv-13723-IT |
| DOMINO'S PIZZA, INC.; DOMINO'S PIZZA LLC; GDS ENTERPRISES, INC.; GEOFFREY D. SCHEMBECHLER, | : : : : : | |
| Defendants. | : : | |

———————————————————————

## PLAINTIFFS' ASSENTED-TO MOTION FOR FINAL
## APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to Fed. R. Civ. P. 23, plaintiffs seek final approval of a proposed class

settlement. A proposed order is attached as Ex. 1.

Following the Court's preliminary approval of the parties' Settlement Agreement and

Release of Claims ("Settlement"), notice of the proposed settlement was sent to potential

members of the class via first-class mail on or about October 15, 2017. No settlement class

member objected to the Settlement by the stated deadline of December 1, 2017 (or thereafter).

As of that deadline, and as discussed in more detail below, 158 individuals submitted timely and

complete claim forms. If the Court grants its final approval of the Settlement, and because the

Settlement is being distributed in two rounds, an additional notice will be sent to all class

members who have not already submitted a claim form to provide them a final opportunity to

receive their share of the settlement fund. As discussed in more detail below, because the

Settlement meets all requirements for approval pursuant to Fed. R. Civ. P. 23, the plaintiffs

respectfully request that this motion be allowed.

## Introduction

This action was brought on behalf of delivery drivers for Domino's stores owned and operated by defendant GDS Enterprises, Inc. ("GDS"), a Domino's franchisee. The drivers were not permitted to retain "delivery charges" that GDS added to customer orders, and, for at least a portion of the class period, drivers were paid only a tipped minimum wage for all of their hours, including time spent performing deliveries and time spent inside the store. The plaintiffs make two principal claims: (1) under the Massachusetts Tips Law, Mass. Gen. Laws ch. 149, § 152A, delivery charges were gratuities that should have been paid to the drivers, and (2) under the Massachusetts Minimum Wage Law, Mass. Gen. Laws ch. 151, §§ 1 & 7, delivery drivers should have been paid the full minimum wage instead of a tipped minimum wage, for two reasons: (a) they did not get to keep all delivery charges, so they should have been paid the full minimum wage for all hours, and (b) they performed substantial "inside" work, for which they should have been paid the regular minimum wage rather than the tipped minimum wage.

The Court previously certified two classes, including (1) a "service charge class" of all individuals who have worked as delivery drivers for GDS from September 28, 2011 to the present, and (2) a "minimum wage class" of all individuals who have worked as delivery drivers for GDS from September 28, 2011 to the present and were paid a tipped minimum wage. (ECF No. 73).

The parties reached a proposed settlement agreement ("Agreement") after engaging in extensive and lengthy arms-length negotiations – beginning with a day-long mediation with experienced wage-and-hour mediator Mark Irvings on May 31, 2017. A copy of the Agreement, which has been executed by the defendants and both of the named plaintiffs, is attached as Ex. 2.

In reaching this agreement, the parties were mindful of the substantial risks to all parties from continued litigation. For the plaintiffs, those risks include the following:

- The risk that the defendants would be unable to pay a class judgment in the plaintiffs' favor. Although the Domino's defendants, as opposed to GDS, likely have a sufficient ability to pay any judgment here, their potential liability is limited to the small portion of delivery charges that plaintiffs allege they collected from GDS as part of royalty payments. GDS, who is the principal defendant, does not have the same level of resources, and could be pushed into bankruptcy with a substantial judgment.

- The risk that the plaintiffs would lose their claims. Most significantly, in a closely-related case, *Lisandro v. Domino's Pizza, Inc., et al.*, Civil Action No. 15-11584-WGY, the named plaintiff had an exemplar trial that ended in a verdict for the defendants on all claims.

- The risk that certified classes would later be decertified, either by this Court or on appeal. Under Fed. R. Civ. P. 23, this Court has the power to decertify a class at any point prior to judgment, and there is simply no way to predict what would happen if this case proceeded in litigation, including an appeal.

- The risk that any of the two named plaintiffs would be picked off or otherwise lose their ability to serve as a class representative. If anything happened with the named plaintiffs (as happened in earlier, related cases), the classes they seek to represent would be at risk of decertification.

Another important consideration supporting this settlement is the defendants' ongoing attempts to remedy the underlying bases for the asserted violations. GDS has taken corrective actions since this case was filed in 2014, including the use of box toppers dedicated to providing notice to customers that a delivery charge is not a tip, the use of credit card folios with a notice that delivery charge is not a tip, and the addition of a disclosure on credit card slips that delivery charge is not a tip. Domino's, meanwhile, has moved the notice language on its website and mobile application to a more prominent location (in bold typeface directly above the "Order" button) and changed the colors on the mobile application to make the notice more visible. All of these actions likely have benefitted or will benefit drivers.

The proposed settlement calls for the payment of $650,000 into a settlement fund. Although the plaintiffs' best-case scenario, making all assumptions in their favor, could result in a considerably higher judgment, the prospects of actually recovering on such a judgment are low given the risks outlined above. Indeed, there is a very substantial likelihood that a "best-case scenario" judgment would result in GDS's bankruptcy and the resulting closure or sale of its stores. When plaintiffs' counsel evaluated the case using realistic assumptions in light of the overall circumstances of the case, this settlement amount – which (based on protracted negotiations with the aid of the professional mediator) appears to represent the maximum that the defendant could and would voluntarily pay at this point – was fair, reasonable, and adequate. That is particularly true given the non-monetary steps the defendants have taken to address the underlying alleged violations.

This is a non-reversionary settlement, meaning that no money will revert back to the defendants. There will be two rounds of distributions, both for GDS's cash flow purposes and to maximize the likelihood that class members will have notice of the settlement and an opportunity to submit a claim. In accordance with the agreement, the two named plaintiffs seek incentive payments in the amount of $20,000 each, in recognition of their willingness to serve as class representatives, their efforts to advance this litigation (including depositions and a full-day mediation), and their willingness to forego larger individual settlements for the benefit of their fellow class members.[1] Plaintiffs' counsel, who have been pursuing these claims for over three years, seek fees in the amount of one-third of the settlement fund, and the plaintiffs seek up to $30,000 to cover the costs of litigation and, more significantly, of administering the settlement,

---

[1] In late 2015, the two named plaintiffs were offered a combined total of $35,000 by GDS to settle their cases on an individual basis, and they rejected that offer in order to continue pursuing the case on behalf of the class.

including the hiring of a third-party administrator to issue notice to the class, process claims, set up a qualified settlement fund, issue payments, and submit required reports and returns. The amount to be distributed to the participating class members will be at least $365,500. Class members will receive shares in proportion to their estimated damages. To the extent any class members do not claim their shares following a second round of notice, those unclaimed funds would be redistributed to the class members who did claim their shares, in proportion to their estimated damages.

Following this Court's preliminary approval of the Settlement on October 11, 2017, plaintiffs' counsel engaged an experienced third-party administrator, Optime Administration, LLC ("Optime"), to manage the notice and claims process. (Affidavit of Scott Simpson ("Simpson Aff."), attached as Ex. 3, ¶¶ 1-2). Optime sent notices to 1,679 potential members of the class via first-class mail on or about October 15, 2017, in the form attached as Ex. 4. (Id. ¶ 4). The Notice describes the claims and likely defenses, the proposed settlement terms, and the plan of distribution, and it invited class members to submit claims for their share of the settlement proceeds. The Notice also informed class members of the final approval hearing and of their opportunity to voice any objections to the terms of the settlement or to opt out from the settlement.

Although Optime sent notices to 1,679 potential members of the class, that number reflected a large number of duplicate employees. For example, when the same employee worked at multiple locations, he or she would be listed for each location. Because the list might have had different addresses for the same employee (reflecting address changes during the time they worked for the Defendants), the actual number of class members was far less. To maximize the likelihood that all potential class members were reached, notices were sent to all addresses. As

demonstrated by discovery in this and prior Domino's cases, the Domino's PULSE data has proven to be the most reliable source of evidence regarding class damages, reflecting both the affected employees and the amount of the employee's potential damages. (Affidavit of Stephen Churchill ("Churchill Aff."), attached as Ex. 5, ¶ 11). Based on our analysis of PULSE data provided by the Defendants in this case, the number of affected employees numbers about 550. (Churchill Aff. ¶ 12).

Of the 1,679 original notices that were mailed, 265 were returned as undeliverable. (Simpson Aff. ¶ 5). That number is not surprising, both because the notices were sent to multiple addresses for the same employees and because this workforce, comprised of low-wage and often immigrant workers, is known to be relatively mobile. (Churchill Aff. ¶ 13). In any event, Optime used public information to successfully identify updated addresses for 89 of the returned notices. (Simpson Aff. ¶ 5). It was unable to find updated addresses for 176 of the returned notices. (Id.).

As of the December 1, 2017 deadline, no members of the settlement class objected to the settlement. (Simpson Aff. ¶ 6). Optime received 158 claim forms by the claim deadline. (Id.). With respect to eligible drivers who received notices but did not submit claim forms, there are two points to make. First, it is not uncommon for some eligible class members to ignore or reject the opportunity to participate in a class settlement. (Churchill Aff. ¶ 13). Second, once the first payments go out, word of those payments is likely to prompt a new group of claimants, all of whom will be able to participate given the parties' agreement to have two rounds of distributions. (Id.).

## Argument

### 1.    The proposed settlement is fair, reasonable, and adequate.

A class action may not be compromised without court approval, which requires the court

to analyze whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). A

guiding principle when analyzing whether a settlement is fair, reasonable, and adequate is the

well-established recognition that courts favor settlements over continued litigation. *Durett v.*

*Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (when exercising discretion to

approve class action settlement, a "court's discretion is restrained by 'the clear policy in favor of

encouraging settlements'") (citations omitted). *See also Newberg* § 11.41 ("The compromise of

complex litigation is encouraged by the courts and favored by public policy.").

In light of the policy favoring settlements, "[w]hen sufficient discovery has been

provided and the parties have bargained at arms-length, there is a presumption in favor of the

settlement." *In re M3 Power Razor System Marketing & Sales Practice Litig.*, 270 F.R.D. 45,

62-63 (D. Mass. 2010). Specifically, when the following "procedural guidelines have been

followed," there is a "presumption that the settlement is within the range of reasonableness:"

"'(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the

proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of

the class objected.'" *Id.*, quoting *In re Lupron Mktg. and Sales Prac. Litig.*, 345 F. Supp. 2d 135,

137 (D. Mass. 2004). All four factors support approval here.

First, the negotiations occurred at arms length, including a day-long mediation with Mark

Irvings. The parties took opposing positions with respect to liability and damages but were able

to reach a compromise position. Second, the parties engaged in substantial discovery prior to

reaching a proposed agreement. "The pertinent question is 'whether counsel had an adequate

appreciation of the merits of the case before negotiating.'" *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013), *quoting In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir. 2004) (internal quotation marks omitted). Here, the parties not only engaged in discovery but were mindful of a related exemplar case tried to a jury. The parties' discovery was further supplemented by their "participation in a day-long mediation [, which] allowed them to further explore the claims and defenses." *Id*. Third, as this Court previously has recognized, plaintiffs' counsel are experienced in employment law and class action litigation. Finally, there were no objections to the proposed settlement.

**2.      The proposed payments to the named plaintiffs are fair and reasonable.**

The proposed payments to the named plaintiffs are intended to compensate them for the effort and risk associated with their role in serving as named plaintiffs over the past two years. Courts have widely recognized that incentive awards serve an important function in promoting enforcement of state and federal law by private individuals, while encouraging class action settlements. *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005) ("Incentive awards are recognized as serving an important function in promoting class action settlements"), *quoting In re Lupron*, 228 F.R.D. 75, 98 (D. Mass. 2005); *In re Compact Disc Min. Adver. Price Antitrust Litig.*, 292 F. Supp. 2d 184, 189 (D. Me. 2003) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit"). As one court recently noted, "[s]ervice awards [i.e., incentive payments] are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs. . . It is

important to compensate plaintiffs for the time they spend and the risks they take." *Beckman*,

293 F.R.D. at 483 (citations omitted).

It is not uncommon for courts to approve incentive payments in the range of those

requested in this case. *See, e.g., Gordon v. Mass. Mutual Life Ins. Co.,* No. 13-CV-30184-MP,

Order Regarding Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Case

Contribution Awards for Named Plaintiffs, at 7 (D.Mass. Nov. 3, 2016) (awarding incentive

payments of $20,000 each to named plaintiffs); *Castagna v. Madison Square Garden, L.P.*, 2011

WL 2208614, at *8 (S.D.N.Y. June 7, 2011) (awarding incentive payments of $10,000 and

$15,000 each to named plaintiffs in wage class action); Dupler v. Costco Wholesale Corp., 705

F. Supp. 2d 231, 245 (E.D.N.Y. 2010) (awarding incentive payments of $25,000 and $5,000);

*Godshall v. Franklin Mint Co.*, 2004 WL 2745890, at *6 (E.D. Pa. Dec. 1, 2004) (awarding

$20,000 incentive awards to each of two named plaintiffs in wage class action); *In re Lorazepam*

*& Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (awarding incentive

payments of $25,000 and $10,000). Massachusetts courts routinely have approved comparable

incentive payments.[2]

Incentive awards serve a particularly important role in employment class actions.

Although plaintiffs do not contend that the defendants engaged in any retaliatory actions against

them, in employment class actions generally, lead plaintiffs may risk their livelihood to bring the

---

[2] *See, e.g., Godt et al. v. Anthony's Pier Four, Inc.,* Suffolk Civ. A. No. 07-3919 (Mass. Super. 2009) ($25,000 incentive payment for lead plaintiff); *Shea v. Weston Golf Club*, Middlesex Civ. A. No. 02-1826 (Mass. Super. 2009) ($25,000 incentive payments for lead plaintiffs); *Fernandez v. Four Seasons Hotel,* Suffolk Civ. A. No. 02-4689 (Mass. Super. 2008) ($25,000 incentive payments for lead plaintiffs); *Banks v. SBH Corp.,* Mass. Civ. A. No. 04-3515 (Mass. Super. 2007) ($25,000 incentive payments for lead plaintiffs); *Meimaridis v. Brae Burn Country Club*, Middlesex Civ. A. No. 04-3769 (Mass. Super. 2006) ($25,000 incentive payments for lead plaintiffs).

case forward on behalf of their fellow co-workers. Courts have recognized the important role of

class actions in the employment context precisely because of this fear of potential retaliation.

*See, e.g., Perez v. Safety-Kleen Systems, Inc.*, 253 F.R.D. 508, 520 (N.D. Cal. 2008) (concluding

class action was superior because "some class members may fear reprisal"); *Guzman v. VLM,*

*Inc.*, 2008 WL 597186, at *8 (E.D.N.Y. 2008) (noting "valid concern" that "many employees

will be reluctant to participate in the action due to fears of retaliation"). This same consideration

makes incentive awards appropriate in employment class action settlements, as well: "[Incentive]

awards are particularly appropriate in the employment context. In employment litigation, the

plaintiff is often a former or current employee of the defendant, and thus, by lending his name to

the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse

actions by the employer or co-workers."  *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187

(W.D.N.Y. 2005).

One critical factor here is the fact that the named plaintiffs put their own interests behind

those of the class. There is a substantial likelihood, based both on the history of this case and on

common experience in this practice area, that if the named plaintiffs had expressed an interest in

obtaining an individual settlement in return for dropping their pursuit of a class claim, they could

have received greater amounts than they stand to receive from this settlement. Instead, they

continued to pursue the case on behalf of their fellow class members.

**3.      The requested award of fees should be approved as reasonable.**

Courts typically favor an award of fees from a common fund, as called for by the

proposed settlement in this case. As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a
> common fund for the benefit of persons other than himself or his client is entitled
> to a reasonable attorneys' fee from the fund as a whole. . . . Jurisdiction over the
> fund involved in the litigation allows a Court to prevent . . . inequity by assessing

attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted). *See also In re Thirteen Appeals*, 56 F.3d 295 (1st Cir. 1995) (awarding attorneys' fees of $68 million out of a $220 million settlement fund).

When awarding fees from a common fund, the "percentage of the fund" method is preferred over the lodestar method. As the First Circuit observed, the percentage method is less burdensome to administer than the lodestar method. *In re Thirteen Appeals*, 56 F.3d at 307. The court also endorsed the percentage method because it is result-oriented, and therefore promotes a more efficient use of attorney time; in contrast, a loadstar method may give attorneys an incentive to spend as many hours as possible on the litigation and may discourage early settlements. *Id.* When using the percentage method, courts routinely approve fee awards that represent one-third of the settlement fund.[3]

---

[3] There are numerous examples of class cases from this and other districts in which a one-third fee was approved, including: *Krueger v. Ameriprise Fin., Inc.*, 2015 U.S. Dist. LEXIS 91385, at *8 (D.Minn. July 13, 2015) (approving one-third fee from common fund); *Bilewicz v. FMR, LLC*, 2014 U.S. Dist. LEXIS 183213, at *18-19 (D.Mass. Oct. 15, 2014) (Casper, J.) (awarding a one-third fee from a $12 million recovery); *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, C.A. No. 10-10588-DFS (D.Mass. May 12, 2014) (approving one-third fee from $10 million recovery); *Chalverus v. Pegasystems, Inc.*, C.A. No. 97-12570-WGY (Dec. 19, 2000) (awarding as an attorneys' fee one-third of a more than $5 million recovery); *In re Lithotripsy Antitrust Litigation*, 2000 U.S. Dist. LEXIS 8143, at *6-7 (N.D. Ill. June 12, 2000) (noting that 33.3% of the fund plus expenses is well within the generally accepted range of the attorneys fee awards in class-action lawsuits); *In re Picturetel Corporation Sec. Litig.*, C.A. No. 97-12135-DPW (D. Mass. Nov. 4, 1999) (approving award of one-third of a $12 million settlement fund); *Zeid v. Open Environment Corp.*, C.A. No. 96-12466-EFH (D. Mass. June 24, 1999) (awarding a fee of one-third of a $6 million settlement); *In re Medical X-Ray Film Antitrust Litigation*, 1998 U.S. Dist. LEXIS 14888, at *21 (E.D.N.Y. Aug. 7, 1998) (awarding a fee of $13 million, which represented one-third of the settlement); *In re Copley Pharmaceutical, Inc. Sec. Litig.*, C.A. No. 94-11897-WGY (D. Mass. Feb. 8, 1996) (awarding one-third of a $6.3 million settlement fund); *In re Crazy Eddie Securities Litig.*, 824 F. Supp. 320, 325-26 (E.D.N.Y. 1993) (awarding 34% of a $42 million fund).

An award of 33 percent of the fund is consistent with the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees. Unlike traditional firms that receive hourly fees on a monthly basis, plaintiffs' counsel who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, travel, etc.), without receiving any ongoing payment for their work. Sometimes fees and expenses are recovered; other times, despite hundreds of hours of work, nothing is recovered. This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees. Courts have long recognized this reality. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate"); *In re Union Carbide Corp. Consumer Products Business Securities Litigation*, 724 F. Supp. 160, 168 (S.D.N.Y. 1989) ("Contingent fee arrangements implicitly recognize the risk factor in litigation and that the winning cases must help pay for the losing ones if a lawyer who represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth is, will remain solvent and available to serve the public interest.")  By permitting clients to obtain attorneys without having to pay hourly fees, this system provides critical access to the courts for people who otherwise would not be able to find competent counsel to represent them. That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue in this case. It is well recognized that "private suits provide a significant supplement to the limited resources

available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).

In addition to the above considerations, numerous other factors favor the requested award of fees in this case, including the results achieved (both economic and non-economic), the length of the litigation, the risks of non-payment, lodestar considerations, and the quality of counsel. First, a large number of class members will benefit from the proposed settlement. Because many of these class members worked for the defendants for relatively short periods of time, the longer-term class members (whose pro rata share of the available settlement proceeds will be correspondingly larger) are expected to receive awards of well over $1,000 each, representing the equivalent of hundreds of reimbursed delivery charges per driver. In addition, after the first in this series of cases was filed against other Domino's franchisees in 2013, the Defendants implemented a number of changes that have benefitted drivers, including the use of additional or more conspicuous notices (i.e., notices that the delivery charge is not a tip paid to drivers) that are more likely to be seen by Domino's customers.

Second, this litigation has been ongoing for over three years. This case was filed in 2014. Throughout this time, plaintiffs' counsel has devoted many hours of effort, while facing the real risk of receiving nothing for that commitment of time. Moreover, plaintiffs' counsel was advancing significant litigation costs (as detailed below), again facing the risk that those costs would never be reimbursed.

Third, although plaintiffs' counsel are not seeking an award of fees based on a lodestar analysis, the lodestar here further supports the requested award. To date, plaintiffs' counsel have spent over 110 hours on these four cases, including 96 hours for Attorney Churchill and 14.8 hours for Attorney Casavant. (Churchill Aff. ¶¶ 5-6). This Court previously has awarded fees to

Attorney Churchill at the rate of $425 per hour and to Attorney Casavant at the rate of $275 per hour. *Carpaneda v. Domino's Pizza, Inc.,* 89 F. Supp. 3d 219, 228-29 (D.Mass. 2015). As a result, the current lodestar is about $45,000. Plaintiffs' counsel will expend substantially more hours in the course of settlement administration. The requested fees of $214,500, therefore, will represent a multiplier of about 4.77, which is well within the range of reasonableness for a class action. *See, e.g., Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (multiplier of 4.65); *In re Rite Aid Corp. Secs. Litig*., 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001) (concluding that, under the cross-check approach, a lodestar multiplier in the range of 4.5 to 8.5 was "unquestionably reasonable"); *New Eng. Carpenters Health Benefits Fund v. First Databank*, 2009 U.S. Dist. LEXIS 68419, at *8 (D.Mass. Aug. 3, 2009) (Saris, J.) (awarding a fee representing a multiplier of approximately 8.3 times the lodestar).

Finally, plaintiffs' counsel are well qualified in class action and wage-and-hour litigation. Mr. Churchill is a 1988 graduate of Stanford University and a 1993 graduate of Harvard Law School. (Churchill Aff. ¶ 1). Following his admission to the Massachusetts bar in 1993, he has focused primarily on employment law. (Id. ¶ 1). From 2004 to 2010, after 11 years of handling employment matters in private firms, he worked at Harvard Law School as a Clinical Instructor, running the Employment Civil Rights Clinic at the WilmerHale Legal Services Center. (Id. ¶ 2). From 2007 to the present, he has taught employment law courses each year at Harvard Law School. (Id.). From 2010 to 2013, he worked at Lichten & Liss-Riordan, P.C., a nationally-recognized employment law firm, handling both individual and class action litigation on behalf of employees. (Id.). He has been counsel on numerous reported cases, has spoken on or moderated a number of panels addressing employment law issues, and has written a number of articles or papers on employment law matters. (Id. ¶ 4).

For all of the foregoing reasons, the requested award of attorneys' fees in the amount of $214,500 is fair and reasonable.

**4.      The requested award of costs is fair and reasonable.**

It is well established that "[l]awyers who recover a common fund for a class are entitled to reimbursement of litigation expenses that were reasonably and necessarily incurred in connection with the litigation." *Hill v. State St. Corp.*, 2014 U.S. Dist. LEXIS 179702, at *53 (D. Mass. Nov. 26, 2014) (Dein, J.), *citing In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999); *Latorraca v. Centennial Techs. Inc.*, 834 F. Supp. 2d 25, 28 (D. Mass. 2011). Including the litigation costs already incurred by plaintiffs' counsel and expected settlement administration costs, plaintiffs' counsel will have total out-of-pocket expenses of approximately $9,671. (Churchill Aff. ¶¶ 7-8). Those expenses include outlays for filing fees, deposition transcripts, and mediation fees. (Id. at ¶ 7). The settlement administration costs alone (that is, the amount to be paid to a professional third-party administrator) are expected to total $23,924. (Id. at ¶ 8). The settlement agreement provides for an award of costs of up to $30,000, so plaintiffs' counsel is requesting an award in that amount. Even with that award, plaintiffs' counsel will have over $3,500 in uncompensated costs, but they are willing to forgo complete reimbursement of those costs to ensure that a greater amount of the settlement goes to class members.

**Conclusion**

For these reasons, plaintiffs respectfully request that the Court grant final approval of the proposed class settlement, as set forth in the proposed order attached as Ex. 1.

Respectfully submitted,

ALEXANDER MOONEY and
KEVIN BARTLETT, individually and on
behalf of all others similarly situated,

  /s/ Stephen S. Churchill
Stephen S. Churchill (BBO#564158)
Brant Casavant (BBO#672614)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-6230
steve@fairworklaw.com
brant@fairworklaw.com

Dated: January 3, 2018

ASSENTED TO:


/s/ Daniel J. Blake
Kevin G. Kenneally, BBO #:  550050
Kevin.Kenneally@leclairryan.com
Daniel J. Blake, BBO #:  552922
Daniel.Blake@leclairryan.com
LECLAIRRYAN, *A Professional Corporation*
One International Place, Suite 1110
Boston, MA 02110
(617) 502-8200
(617) 502-8201 – Fax

## CERTIFICATE OF CONSULTATION

I certify that I conferred with defendant's counsel regarding the issues presented in this motion. Defendants' counsel has reported that the defendants assent to this motion.

Dated:  January 3, 2018          /s/ Stephen Churchill
                                 Stephen Churchill

## CERTIFICATE OF SERVICE

This will certify that I served a copy of the foregoing document on all counsel, by electronic mail, on this date.


Dated:  January 3, 2018          /s/ Stephen Churchill
                                 Stephen Churchill


903612189-1